## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KEVIN HAZURE, JR.** *individually and on*
*behalf of all others similarly situated*,                      Case No.

                                     **Plaintiff,**

                  **v.**

**XAVIER UNIVERSITY**
**OF LOUISIANA**                                           **JURY TRIAL DEMANDED**

                           **Defendant.**

## CLASS ACTION COMPLAINT

Plaintiff Kevin Hazure, Jr. ("Plaintiff Hazure" or "Plaintiff") brings this Class Action Complaint against Defendant Xavier University of Louisiana ("Xavier" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and alleges as follows:

### INTRODUCTION

1.     Xavier is a private college located in New Orleans, Louisiana. Defendant failed to implement and maintain reasonable data security measures. As a result, in November 2022, a well a well-known cybercriminal organization named Vice Society accessed and exfiltrated Plaintiff's and Class Members' personally identifiable information ("PII"), including full names and Social Security numbers (the "Data Breach").

2.     Vice Society demanded that Xavier pay a ransom for the return of PII stolen in the Data Breach. Xavier refused to pay this ransom. As a result, Vice Society leaked Plaintiff's and Class Members' PII on the dark web.

3.     Despite the now-certainty that PII stolen in the Data Breach will be used for harm, Defendant did not begin notifying victims of the Data Breach, like Plaintiff, until February—long

after Defendant understood the risk that Plaintiff and Class Members faced.

4.      When notifications were finally sent, Xavier also omitted crucial information, such as the fact that it refused to pay a ransom, and as a result, Plaintiff's and Class Members' PII was confirmed to be on the dark web.

5.      The Data Breach was conducted using foreseeable tactics that Xavier should have recognized and prevented.

6.      Just a couple months before the Data Breach, the Federal Bureau of Investigations ("FBI") and the Cybersecurity and Infrastructure Security Agency ("CISA") released a joint advisory specifically warning educational institutions like Xavier of Vice Society's techniques, along with information on how to prevent the success of such techniques.[1]

7.      Although Xavier reprehensibly decided to keep many details of the Data Breach secret, the evidence available as of the date of this filing demonstrates that it is more likely than not that Defendant failed to implement and maintain reasonable data security measures, including those listed in the Joint Advisory.

8.      For example, Defendant failed to properly encrypt or redact PII, maintained PII longer than it had a legitimate use, and failed to properly secure user credentials to internet facing applications on its network.

9.      Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

---

[1] *See* Joint Cybersecurity Advisory, #StopRansomware: Vice Society (Sept. 6, 2022), located at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-249a-0 (last visited March 9, 2023).

## PARTIES

### *Plaintiff Kevin Hazure, Jr.*

10.     Plaintiff Kevin Hazure, Jr. is a resident and citizen of Los Angeles, California, and he intends to remain there for the foreseeable future. Plaintiff was a student at Xavier over 12 years ago. Plaintiff received a notice letter in the mail directly from Defendant, dated February 2, 2023, informing him that his name and Social Security number were compromised in the Data Breach.

### *Defendant Xavier University of Louisiana*

11.     Defendant Xavier is a private university incorporated in the State of Louisiana and headquartered at 1 Drexel Drive, New Orleans, Louisiana 70125.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiff, is a citizen of a state different from Defendant.

13.     This Court has general personal jurisdiction over Defendant because Defendant's principal place of business is in Louisiana, and Defendant regularly conducts business in Louisiana, and has a location in New Orleans, Louisiana.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District, Defendant conducts substantial business in this District, and Defendant is headquartered in New Orleans, Louisiana.

## FACTUAL ALLEGATIONS

*Background*

15.     Plaintiff and the Class Members, as current or former students, applicants, or employees of Xavier, reasonably relied (directly or indirectly) on this sophisticated higher education institution to keep their sensitive PII confidential; to maintain its system security; to use this information for business purposes only; and to make only authorized disclosures of their PII. People demand security to safeguard their PII, especially when Social Security numbers are involved as here.

16.     Xavier had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties and as evidenced by the Data Breach, it failed to adhere to that duty.

*The Data Breach*

17.      On November 22, 2022, Vice Society executed a foreseeable attack of Xavier's computer network that allowed it to steal the highly sensitive PII of at least 44,312 current and former students and employees.[2]

18.     Sample notice letters provided to several states attorneys general have stated that impacted PII included names and Social Security numbers.[3]

---

[2] https://apps.web.maine.gov/online/aeviewer/ME/40/81b945be-3f23-4b12-9766-197b5c48aefa.shtml (last visited March 9, 2023).

[3] https://ago.vermont.gov/document/02-02-2023-xavier-university-data-breach-notice-consumers; https://apps.web.maine.gov/online/aeviewer/ME/40/81b945be-3f23-4b12-9766-197b5c48aefa.shtml; https://oag.ca.gov/ecrime/databreach/reports/sb24-563055 (last visited March 9, 2023).

19.     However, there are reports that the PII compromised in the Data Breach also included information about payroll, personal finances, misconduct allegations, and disciplinary actions.[4]

20.     Vice Society demanded that Xavier pay a ransom for the return of its students' and employees' PII, but Xavier refused. As a result, Vice Society publicly leaked the PII on the dark web in an unencrypted and unredacted state.[5]

21.     Reports on this Data Breach have noted that the "dark web" is "an area of the internet that is not picked up by search engines. Any malicious actor on the dark web can download the stolen data for their own purposes, which can include selling it to others."[6]

22.     Experts commenting on this specific Data Breach have stated that "those affected could now be exposed to a range of identity-related fraud crimes."[7] Despite this risk, Defendant did not begin mailing notice letters to victims until February 2023. Moreover, the notice letters it provided to Plaintiff and Class Members did not explain that PII from the Data Breach is now publicly available for access on the dark web.

23.     Despite downplaying the risk, the notice letters sent by Defendant made several "recommendation[s]" on how Plaintiff and Class Members could mitigate the consequences of the Data Breach. For example, notice letters instructed Plaintiff and Class Members to:

> Review Your Account Statements and Notify Law Enforcement of Suspicious Activity: As a precautionary measure, we recommend that you remain vigilant by reviewing your account statements and credit reports closely. If you detect any suspicious activity on an account, you should promptly notify the financial institution or company with which the account is maintained. You also should

---

[4] https://www.scmagazine.com/brief/ransomware/vice-society-claims-leak-of-stolen-xavier-university-data (last visited March 9, 2023).
[5] *Id.*
[6] https://www.govtech.com/education/higher-ed/ransomware-gang-says-it-leaked-data-from-xavier-university-students-staff (last visited March 9, 2023).
[7] *Id.*

promptly report any fraudulent activity or any suspected incidence of identity theft to proper law enforcement authorities, your state attorney general, and/or the Federal Trade Commission (FTC).[8]

24.     Notice letters also informed Plaintiff and Class Members that:

You have the right to put a security freeze on your credit file for up to one year at no cost. This will prevent new credit from being opened in your name without the use of a PIN number that is issued to you when you initiate the freeze. A security freeze is designed to prevent potential creditors from accessing your credit report without your consent. As a result, using a security freeze may interfere with or delay your ability to obtain credit. You must separately place a security freeze on your credit file with each credit reporting agency. In order to place a security freeze, you may be required to provide the consumer reporting agency with information that identifies you including your full name, Social Security number, date of birth, current and previous addresses, a copy of your state-issued identification card, and a recent utility bill, bank statement or insurance statement.[9]

25.     With its offer of credit and identity monitoring services to victims, Xavier is acknowledging that the impacted persons are subject to an imminent threat of identity theft and financial fraud as a result of its failure to protect the PII it collected and maintained.

***The Data Breach was a Foreseeable Risk of which Defendant was on Notice***

26.     It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

27.     Moreover, this Data Breach was "part of an increasing trend of attacks against higher education."[10]

---

[8] https://ago.vermont.gov/document/02-02-2023-xavier-university-data-breach-notice-consumers; https://apps.web.maine.gov/online/aeviewer/ME/40/81b945be-3f23-4b12-9766-197b5c48aefa.shtml; https://oag.ca.gov/ecrime/databreach/reports/sb24-563055 (last visited March 9, 2023).

[9] *Id.*

[10] https://www.govtech.com/education/higher-ed/ransomware-gang-says-it-leaked-data-from-xavier-university-students-staff (last visited March 9, 2023).

28.    "A total of 88 education sector organizations were impacted by ransomware in 2021: 62 school districts and the campuses of 26 colleges and universities. The attacks disrupted learning at 1,043 individual schools."[11]

29.    "The numbers were almost identical in 2020: 84 incidents impacting 58 districts, and 26 colleges and universities. The number of schools impacted was, however, significantly greater at 1,681. This means that the average number of schools impacted by each incident decreased from 20 in 2020 to only 12 in 2021 – perhaps signaling that, as with governments, larger organizations are using their larger budgets wisely."[12]

30.    At the time of the Data Breach, the specific threat posed by Vice Society was known, or should have been known, by Xavier.

31.    Experts have described Vice Society "as a second- or maybe third-tier group overall, compared to big names like LockBit, Hive, and Black Cat …."[13] "But the bulk of their victims are either in the education or health care sectors, and their attacks make up a significant chunk of the total known attacks in those categories for 2021 and 2022 …. They loom large in those two sectors."[14]

32.    At the time, Vice Society was in the midst of a spree using well documented techniques to target education providers like Xavier.

---

[11] https://www.emsisoft.com/en/blog/40813/the-state-of-ransomware-in-the-us-report-and-statistics-2021/amp/ (last visited March 9, 2023).
[12] *Id.*
[13] https://www.wired.com/story/vice-society-ransomware-gang/ (last visited March 9, 2023).
[14] *Id.*

33.     As one publication noted in a report about the Data Breach, "Vice Society has carried out more than 100 cyber attacks around the world since it surfaced in mid-2021 …. About 40 of those attacks have targeted the education sector."[15]

34.     Approximately two months before the Data Breach, "Vice Society attacked the Los Angeles Unified School District … and leaked 500 gigabytes of sensitive student data, according to Wired magazine."[16] "After the school system refused to pony up, [Vice Society] released the trove, which contained sensitive data of students who had attended LAUSD between 2013 and 2016, including their Social Security numbers, financial and tax information, health details, and even legal records. And as LAUSD set up a hotline for worried families and scrambled to deal with the fallout, the hacking group behind the attack moved on, seemingly without making any money off the incident."[17]

35.     "That attack prompted federal authorities to issue a warning that the group was primarily taking aim at schools."[18] Specifically, on September 8, 2022, the FBI and CISA released a joint advisory (the "Joint Advisory") detailing the risk posed by Vice Society to education providers, the common techniques employed by Vice Society, and mitigation measures known to prevent Vice Society attacks.[19]

---

[15]https://www.govtech.com/education/higher-ed/ransomware-gang-says-it-leaked-data-from-xavier-university-students-staff (last visited March 9, 2023).

[16] *Id.*

[17] How Vice Society Got Away With a Global Ransomware Spree (Oct. 20, 2022), https://www.wired.com/story/vice-society-ransomware-gang/ (last visited March 9, 2023).

[18]https://www.govtech.com/education/higher-ed/ransomware-gang-says-it-leaked-data-from-xavier-university-students-staff (last visited March 9, 2023).

[19] *See* Joint Cybersecurity Advisory, #StopRansomware: Vice Society (Sept. 6, 2022), located at https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-249a-0 (last visited March 9, 2023).

*Defendant Failed to Implement & Maintain Reasonable Security*

36.    As discussed above, the Joint Advisory details the specific methods of attack used by Vice Society, along with how to prevent them. Specifically, "Vice Society actors likely obtain initial network access through compromised credentials by exploiting internet-facing applications." *Id.*

37.    CISA has also noted that the following practices are "exceptionally risky":

Use of known/fixed/default passwords and credentials in service of Critical Infrastructure and National Critical Functions is dangerous and significantly elevates risk to national security, national economic security, and national public health and safety. This dangerous practice is especially egregious in technologies accessible from the Internet.

The use of single-factor authentication for remote or administrative access to systems supporting the operation of Critical Infrastructure and National Critical Functions (NCF) is dangerous and significantly elevates risk to national security, national economic security, and national public health and safety. This dangerous practice is especially egregious in technologies accessible from the Internet.[20]

38.    Given that Vice Society likely effectuated the Data Breach through compromised user credentials, it is more likely than not that the "bad practices" identified by CISA were employed by Defendant at the time of the Data Breach.

39.    The access to and exfiltration of PII by Vice Society would not have occurred but for Defendant's failure to implement and maintain the data security measures discussed in the Joint Advisory and other advisory materials.

40.    Indeed, "Vice Society is, in many ways, an unremarkable ransomware gang."[21] Vice Society "relies on exploiting known vulnerabilities" for success. [22]

---

[20] https://www.cisa.gov/stopransomware/bad-practices (last visited March 9, 2023).
[21] https://www.wired.com/story/vice-society-ransomware-gang/ (last visited March 9, 2023).
[22] *Id.*

41.     Experts have referred to its methods of attack as "technically unremarkable,"[23] and noted that Vice Society is "a perfect example of the success of mediocrity in the ransomware ecosystem," compared to the "top-tier groups developing their own zero days and acting all polished and professional. But meanwhile, Vice Society is just chugging along, not really innovating, stealing tools from other folks, but they have just enough stability to launch attacks, get paid, keep moving."[24]

42.     Regardless of Xavier's failure to properly secure and monitor PII, Xavier was also grossly negligent in its decision to not properly encrypt or redact the PII in its possession, as well as its decision to hold PII for longer than it had a legitimate use. For instance, Plaintiff has not been affiliated with Xavier for over a decade, but Defendant nonetheless continued to store his PII on its system.

### The Theft of PII Has Severe & Long-Lasting Consequences

43.     The ramifications of Xavier's failure to keep Plaintiff's and Class Members' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security numbers as here, fraudulent use of that information and damage to victims is likely to continue for years.

44.     Social Security numbers are the "secret sauce" that is "as good as your DNA to hackers." There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their Social Security numbers have been accessed, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems … and won't guarantee … a fresh start."

---

[23] *Id.*
[24] *Id.*

45.     By failing to properly notify Plaintiff and the Class Members of the Data Breach, Defendant exacerbated their injuries. Specifically, by depriving them of the chance to take speedy measures to protect themselves and mitigate harm, Defendant allowed their injuries to fester and the damage to spread.

46.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[25]

47.     Furthermore, trying to change or cancel a stolen Social Security number is no minor task. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

48.     Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that

---

[25] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Dec. 10, 2021).

old bad information is quickly inherited into the new Social Security number."[26]

49.    PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[27]

50.    It can take years for victims to notice their identity was stolen—giving criminals plenty of time to sell one's personal information to the highest bidder.

51.    One example of criminals using PII for profit is the development of "Fullz" packages.

52.    The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiff and the other Class Members.

53.    Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

54.    That is exactly what is happening to Plaintiff and Class Members. And it is reasonable for any trier of fact, including this Court or a jury, to find that the stolen PII (of Plaintiff and the other Class Members) is being misused—and that such misuse is fairly traceable to Defendant's data breach.

---

[26] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed Dec. 10, 2021).
[27] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.

55.     Responsible for handling highly sensitive personal information, Defendant knew or should have known the importance of safeguarding PII. Defendant also knew or should have known of the foreseeable consequences of a data breach. These consequences include the significant costs imposed on victims of the breach.

56.     Still, Defendant failed to take adequate measures to prevent the data breach.

57.     Because of Defendant's inadequate practices, the PII of Plaintiff and Class Members was exposed to criminals.

58.     In other words, Defendant opened up, disclosed, and then exposed its PII to crooked operators and criminals. Such criminals engage in disruptive and unlawful business practices and tactics, like online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud)—all using stolen PII.

59.     Given the nature of Xavier's Data Breach it is foreseeable that the compromised PII has been or will be used by hackers and cybercriminals in a variety of devastating ways.

60.     Indeed, the cybercriminals who possess Plaintiff's and Class Members' PII can easily obtain Plaintiff's and Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

61.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, simple credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[28] The information compromised in this Data Breach is impossible to "close" and

---

[28] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes, Mar 25, 2020, *available at*: https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed Dec. 10, 2021).

difficult, if not impossible, to change (such as Social Security numbers).

62.     To date, Xavier has offered Plaintiff and Class Members *only one or two years* of identity monitoring services from their discovery of the Data Breach to the Notice Letters. The offered services are inadequate to protect Plaintiff and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

63.     The injuries to Plaintiff and Class Members were directly and proximately caused by Xavier's failure to implement or maintain adequate data security measures to protect PII that it maintained.

**The Value of PII**

64.     Stolen personal information is one of the most valuable commodities on the information black market. According to Experian, a credit-monitoring service, stolen personal information can sell for over $1,000.00.[29]

65.     The value of Plaintiff's and Class Members' personal information on the black market is significant.

66.     Stolen personal information trades on the black market for years, and criminals frequently post stolen PII openly and directly on various "dark web" internet websites. Thus, after charging a substantial fee, criminals make such stolen information publicly available.

67.     An active and robust legitimate marketplace for PII also exists.

68.     In 2019, the data brokering industry was worth roughly $200 billion.[30] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information

---

[29] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.
[30] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited March 9, 2023).

directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[31]

69.     As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its acquisition by cybercriminals.

70.     This transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is likely readily available to others, and the rarity of the PII has been destroyed, thereby causing additional loss of value.

71.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[32]

### Xavier Failed to Comply with FTC Guidelines

72.     Federal and State governments have established security standards and issued recommendations to lessen the risk of data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for

---

[31] *See* https://datacoup.com/ (last accessed Oct. 21, 2022).
[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/ anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Dec. 10, 2021).

business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[33]

73.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[34]

74.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[35]

75.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[36] The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

76.    The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[37]

77.    The FTC recommends that businesses:

---

[33]Federal     Trade     Commission,     *Start     With     Security,     available     at*: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf     (last accessed Dec. 10, 2021).
[34] 17 C.F.R. § 248.201 (2013).
[35] *Id*.
[36]Federal Trade Commission, *Protecting Personal Information: A Guide for Business, available at*: https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed Dec. 10, 2021).
[37] FTC, *Start with Security*, *supra* note 59.

a.  Identify all connections to the computers where you store sensitive information.

b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection

a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

78. The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

79. Because Class Members entrusted Xavier with their PII directly or indirectly through Xavier, Xavier had, and has, a duty to the Class Members to keep their PII secure.

80. Plaintiff and the other Class Members reasonably expected that when they provide PII to Xavier that such PII would be protected and safeguarded.

81. Xavier was at all times fully aware of its obligation to protect the personal data of Students, including Plaintiff and members of the Classes. Xavier was also aware of the significant repercussions if it failed to do so.

82. Xavier's failure to employ reasonable and appropriate measures to protect against

unauthorized access to confidential data—including Plaintiff's and Class Members' full names, Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *Plaintiff and Class Members Have Suffered Concrete Injury As A Result Of Defendant's Inadequate Security And The Data Breach It Allowed.*

83.     Plaintiff and Class Members reasonably expected that Defendant would provide adequate security protections for their PII, and Class Members provided Defendant with sensitive personal information, including their Social Security numbers.

84.     Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant for their education, Plaintiff and other Class Members reasonably understood and expected that their PII would be protected with data security, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected. As such, Plaintiff and the Class Members suffered pecuniary injury.

85.     Cybercriminals target and capture PII to exploit it; the Class Members are now, and for the rest of their lives will be, at a heightened risk of identity theft. Plaintiff have also incurred (and will continue to incur) damages in the form of, *inter alia*, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

86.     The cybercriminals who targeted and obtained Plaintiff's and Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets."  Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;

- obtaining a loan;

- applying for credit cards or spending money;

- filing false tax returns;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public document.

87.     In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

88.     As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

89.     Furthermore, certain PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.[38]

90.     Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[39]

91.     Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[40]   Javelin Strategy & Research, a leading provider of quantitative and qualitative

---

[38] *Id.*

[39] *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (Feb. 23, 2012), http://www.iii.org/insuranceindustryblog/?p=267 (last accessed Dec. 10, 2021).

[40] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php (last accessed Dec. 10, 2021).

research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[41]

92.    Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.  Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

93.    As a result of the Data Breach, Plaintiff and Class Members have already suffered damages.

**Plaintiff's Kevin Hazure's Experience**

94.    Plaintiff Hazure greatly values his privacy and is very careful with his PII. Plaintiff Hazure stores any documents containing sensitive PII, like his Social Security number, in a safe and secure location or destroys such documents when they are no longer needed. Plaintiff Hazure has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Moreover, Plaintiff Hazure diligently chooses unique usernames and passwords for online accounts storing sensitive PII.

95.    When Plaintiff Hazure does entrust a third-party with his PII, it is only because he understands such information will be reasonably safeguarded from foreseeable threats, and that he will be timely notified if his PII is exposed.

96.    Plaintiff Hazure was a student at Xavier from 2007 to 2010. When enrolling, Plaintiff Hazure provided PII, including his full name, date of birth, Social Security number, and phone number.

---

[41] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH- IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, (*available at* https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf) (last accessed Dec. 10, 2021).

97.     Plaintiff Hazure reasonably understood that Xavier would encrypt or redact highly sensitive information, like his Social Security number, and that such PII would be deleted after Defendant no longer had a need for it related to his tenure as a student.

98.     Plaintiff Hazure received a letter dated February 2, 2023, from Defendant notifying him of the Data Breach. The letter stated that Plaintiff's name and Social Security number were compromised in the Data Breach.

99.     The letter contained hardly any other information about the Data Breach. However, it recommended that Plaintiff Hazure sign up for credit monitoring, spend time reviewing his accounts, and to consider implementing other security measures, like a fraud alert or credit freeze.

100.    Because the notice letter was mailed to Plaintiff Hazure at the address where he lived while attending Xavier between 2007-2010, Plaintiff Hazure did not learn about the Data Breach until his mother provided him with a copy of the letter in early March 2023.

101.    In response to Defendant's Notice Letter, Plaintiff Hazure has spent significant time verifying the legitimacy of the Notice of Data Breach and reviewing his accounts and intends to take additional steps to mitigate the certainly impending harm from the Data Breach.

102.    Plaintiff Hazure believes that as a result of the Data Breach, he has suffered fraud, including being denied credit, which he learned that was due to a drop in his credit score that occurred in recent months.

103.    Although Plaintiff intends to investigate this potential fraud further, he believes that any such fraud is related to the Data Breach given the temporal proximity and how careful he is with his PII.

104.    As Defendant encouraged in its Notice Letter, Plaintiff Hazure anticipates spending significant time, money, and effort on an ongoing basis to try to mitigate and address the present

and impending injuries caused by the Data Breach.

105.   The Data Breach and exfiltration of Plaintiff Hazure's PII has caused him to suffer a loss of privacy.

106.   This loss of privacy is analogous to the injury caused by the commission of well-recognized common law privacy torts like invasion of privacy.

107.   As a result of the Data Breach, Plaintiff Hazure will face a substantial risk of imminent harm for the rest of his life.

108.   The fraud, loss of privacy, and substantial risk of harm that Plaintiff Hazure faced and continues to face has caused Plaintiff Hazure to suffer proportional fear, stress, anxiety, and nuisance.

109.   Plaintiff Hazure has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property Defendant was required to adequately protect.

110.   Plaintiff Hazure has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

111.   Plaintiff brings this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

112.   Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All individuals residing in the United States whose PII was compromised in the data breach first announced by Defendant on or about February 2, 2023 (the "Class").**

113.   Excluded from the Class are the following individuals and/or entities: Xavier, and Xavier's parents, subsidiaries, affiliates, officers and directors, and any entity in which Xavier has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

114.   Plaintiff reserves the right to modify or amend the definition of the proposed class and any future subclass before the Court determines whether certification is appropriate.

115.   <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of more than 44,000 of individuals whose sensitive data was compromised in Data Breach.

116.   <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

      b.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

      c.   Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.  Whether Defendant owed a duty to Class Members to safeguard their PII;

f.  Whether Defendant breached its duty to Class Members to safeguard their PII;

g.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.  Whether Defendant should have discovered the Data Breach sooner;

i.  Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.  Whether Defendant's conduct was negligent;

k.  Whether Defendant breach implied contracts with Plaintiff and Class Members;

l.  Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m.  Whether Defendant failed to provide notice of the Data Breach in a timely manner, and;

n.  Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

117.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach.

118.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

119.  <u>Predominance</u>. Defendant has engaged in a common course of conduct toward

Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

120.     Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

121.     Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

122.     The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Xavier would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the

costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

123.   The litigation of the claims brought herein is manageable. Xavier's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

124.   Adequate notice can be given to Class Members directly using information maintained in Xavier's records.

125.   Unless a Class-wide injunction is issued, Xavier may continue in its failure to properly secure the PII of Class Members, Xavier may continue to refuse to provide proper notification to Class Members regarding the Data Breach, the PII Xavier continues to maintain will remain at risk of future breach, and Xavier may continue to act unlawfully as set forth in this Complaint.

126.   Further, Xavier has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive relief with regard to the Class Members as a whole is appropriate.

127.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b.   Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c.   Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.   Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e.   Whether Defendant breached the implied contract;

f.   Whether Defendant adequately and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' PII; and/or

i.   Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
### Negligence
**(On Behalf of Plaintiff and the Class)**

128.   Plaintiff and Class Members incorporate the above allegations as if fully set forth herein.

129.   Defendant required Plaintiff and Class Members to submit sensitive, non-public, personal information in order to enroll in one of Defendant's classes or programs or be eligible for employment.

130.   Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and the individuals that entrusted their PII to Defendant. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from the Data Breach.

131.   By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to design, implement, and monitor systems, policies, and processes by which it could reasonably prevent and detect a breach of their security systems in a reasonably expeditious period of time.

132.   Defendant had a duty to use reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

133.   Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure to adequately safeguard their PII in accordance with industry standards concerning data security would result in the compromise of that PII —just like the Data Breach that ultimately came to pass.

134.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

135.   Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the data breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the data breach.

136.   Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

137.   Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' PII . The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b.   Failing to adequately monitor the security of their networks and systems;

c.   Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.   Allowing unauthorized access to Class Members' PII;

e.   Failing to detect in a timely manner that Class Members' PII had been compromised; and

f.   Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

138.  The breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches generally and in the higher-education industry.

139.  It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

140.  Plaintiff and the putative class members had no way to protect themselves from the damage Defendant is responsible for.

141.  The imposition of a duty of care on Defendant to safeguard the PII it maintained is appropriate because any social utility of Defendant's conduct—of which little, if any, exists— is outweighed by the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

142.  Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and unsecure manner.

143.  Louisiana Civil Code Article 2315 concisely states that, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." This law, and the sections that follow it, dictate that Defendant is responsible to repair all the damage caused to the Plaintiff and putative class members as a result of the theft of their personal information. Defendant negligently, and/or recklessly, failed to adopt safeguards that would have prevented the data breach from occurring.

144.  As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

145.  Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

146.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

147.   Plaintiff and Class Members incorporate the above allegations as if fully set forth herein.

148.   Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

149.   Defendant owed a duty to Plaintiff and Class Members to keep this information confidential.

150.   The unauthorized acquisition (*i.e.,* theft) by a third party of Plaintiff and Class Members' PII is highly offensive to a reasonable person.

151.   The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

152.   The data breach constitutes an intentional interference with Plaintiff and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

153.   Defendant acted with a knowing state of mind when it permitted the data breach because it knew its information security practices were inadequate.

154.   Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and Class Members.

155.   As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiff and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and Class Members to suffer damages.

156.   Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members since their PII is still maintained by Defendant with its inadequate cybersecurity system and policies.

157.   Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard their PII.

158.   In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class Members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

159.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

<u>**COUNT III**</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

160.   Plaintiff and Class Members incorporate the above allegations as if fully set forth herein.

161.   Plaintiff's and Class Members' PII was provided to Defendant as part of education services or employment that Defendant provided to Plaintiff and Class Members.

162.   Plaintiff and Class Members agreed to pay Defendant tuition for education and administration services. Additionally, applicants for admission or employment agreed to provide their PII in exchange for Defendant's promise to keep it safe from unauthorized access.

163.   Defendant and Plaintiff and Class Members entered into implied contracts for the provision of adequate data security, separate and apart from any express contracts concerning the security of Plaintiff's and Class Members' PII, whereby, Defendant was obligated to take reasonable steps to secure and safeguard Plaintiff's and Class Members' PII.

164.   Defendant had an implied duty of good faith to ensure that the PII of Plaintiff and Class Members in its possession was only used in accordance with its contractual obligations.

165.   Defendant was therefore required to act fairly, reasonably, and in good faith in carrying out its contractual obligations to protect the confidentiality of Plaintiff's and Class Members' PII and to comply with industry standards and applicable laws and regulations for the security of this information.

166.   Defendant breached the implied contracts by failing to take adequate measures to protect the confidentiality of Plaintiff's and Class Members' PII, resulting in the Data Breach.

167.   The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

168.    As a result of Defendant's conduct, Plaintiff and Class Members did not receive the full benefit of the bargain.

169.    Had Defendant disclosed that its data security was inadequate, neither Plaintiff or Class Members, nor any reasonable person would have entered into such contracts with Defendant.

170.    As a result of Data Breach, Plaintiff and Class Members suffered actual damages resulting from the theft of their PII, as well as the loss of control of their PII, and remain at present risk of suffering additional damages.

171.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach, including the loss of the benefit of the bargain.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

172.    Plaintiff and Class Members incorporate the above allegations as if fully set forth herein.

173.    Plaintiff brings this claim for unjust enrichment in the alternative to Plaintiff's claims for breach of contract above.

174.    Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of monetary payments—directly or indirectly—for providing education or employment to current and former students and employees.

175.    Plaintiff and Class Members also conferred a monetary benefit on Defendant in the form of their PII, from which Defendant derived revenue as it could not provide education, employment, or services without the use of that PII.

176.   Defendant collected, maintained, and stored Plaintiff and Class Members' PII and, as such, Defendant had knowledge of the monetary benefits it received on behalf of the Plaintiff and Class Members.

177.   The money that Plaintiff and Class Members paid to Defendant, or the revenue Defendant derived from the use of their PII, should have been used to pay, at least in part, for the administrative costs and implementation of data security adequate to safeguard and protect the confidentiality of Plaintiff's and Class Members' PII. Additionally, employees conferred a monetary benefit on Defendant as part of their salary and benefits was intended to apply to adequate data security which Defendant did not apply.

178.   Defendant failed to implement—or adequately implement—those data security practices, procedures, and programs to secure sensitive PII, as evidenced by the Data Breach.

179.   As a result of Defendant's failure to implement data security practices, procedures, and programs to secure sensitive PII, Plaintiff and Class Members suffered actual damages in an amount of the savings and costs Defendant reasonably and contractually should have expended on data security measures to secure Plaintiff's PII.

180.   Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement the data security measures adequate to safeguard and protect the confidentiality of Plaintiff's and Class Members' PII.

181.   As a direct and proximate result of Defendant's decision to profit rather than provide adequate security, and Defendant's resultant disclosures of Plaintiff's and Class Members' PII, Plaintiff and Class Members suffered and continue to suffer considerable injuries in the forms

of time and expenses mitigating harms, diminished value of PII, loss of privacy, and a present increased risk of harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all Class Members, requests judgment against the Xavier and that the Court grant the following:

A.    For an Order certifying the Class and appointing Plaintiff and his Counsel to represent the Class;

B.    For equitable relief enjoining Xavier from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and the Class Members' PII, and from refusing to issue prompt, complete, any accurate disclosures to the Plaintiff and the Class;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including but not limited to an order:

    i.    prohibiting Xavier from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Xavier to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    iii.    requiring Xavier to delete, destroy, and purge the personal identifying information of Plaintiff and Class unless Xavier can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and the Class;

iv.   requiring Xavier to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiff's and Class Members' personal identifying information;

v.   prohibiting Xavier from maintaining Plaintiff's and Class Members' personal identifying information on a cloud-based database;

vi.   requiring Xavier to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Xavier's systems on a periodic basis, and ordering Xavier to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Xavier to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Xavier to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Xavier to segment data by, among other things, creating firewalls and access controls so that if one area of Xavier's network is compromised, hackers cannot gain access to other portions of Xavier's systems;

x.   requiring Xavier to conduct regular database scanning and securing checks;

xi.   requiring Xavier to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as

well as protecting the personal identifying information of Plaintiff and Class Members;

xii.    requiring Xavier to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Xavier to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Xavier's policies, programs, and systems for protecting personal identifying information;

xiv.    requiring Xavier to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Xavier's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.     requiring Xavier to meaningfully educate all class members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.    requiring Xavier to implement logging and monitoring programs sufficient to track traffic to and from Xavier's servers;

xvii.   for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate

Xavier's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

D.      For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.      For an award of punitive damages;

F.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.      For prejudgment interest on all amounts awarded; and

H.      Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.


Date: March 10, 2023                          Respectfully Submitted,


                                              */s/ Andrew A. Lemmon*
                                              Andrew A. Lemmon (LA Bar No. 18302)
                                              **MILBERG COLEMAN BRYSON
                                              PHILLIPS GROSSMAN, PLLC**
                                              5301 Canal Boulevard, Suite A
                                              New Orleans, Louisiana 70124
                                              Tel.:    (985)783-6789
                                              Email: alemmon@milberg.com

                                              Gary M. Klinger*
                                              **MILBERG COLEMAN BRYSON
                                              PHILLIPS GROSSMAN, PLLC**
                                              227 W. Monroe Street, Suite 2100
                                              Chicago, IL 60606
                                              Tel.:    (866) 252-0878
                                              Email: gklinger@milberg.com

Terence R. Coates*
Justin C. Walker*
Dylan J. Gould*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Phone: (513) 651-3700
Fax: (513) 665-0219
*tcoates@msdlegal.com*
*jwalker@msdlegal.com*
*dgould@msdlegal.com*

*Attorneys for Plaintiff and the Proposed Class*

*\*pro hac vice applications forthcoming*